Pollard v. the Parole Commission May it please the court, I'm Elliot Lauer for petitioner, Jonathan J. Pollard. We recognize the standard for review is a deferential one, but the Parole Commission does not have absolute arbitrary discretion. The three conditions here, workplace computer monitoring, 24-hour GPS monitoring, and the curfew, all purportedly are based on the supposed possibility that Pollard might retain in his head secret details from documents accessed 32 and 33 years ago, which were created 32 or more years ago, and that Pollard might intentionally disclose such details if he in fact retains them. Since Pollard does not possess any documents, the district court observed that the risk of possible disclosure is based exclusively on the extent to which, if any, Pollard may carry in his head secret details after 32 years. The government fought for and obtained the right to submit ex parte, in camera examples of documents accessed by Pollard, and then in a 180 degree turn, the government chose instead to submit the declaration of Ms. Hudson. And instead of referring to documents actually accessed by Pollard, Hudson states 10 times in the declaration that various still confidential documents are believed to have been compromised by Pollard. This was not an oversight. Neither the government nor the commission has ever offered any evidence, any factual basis, that at least some of the details accessed by Pollard 32 and 33 years ago are of the type that a person could be expected to remember after 32 years. And everything all depends on whether in fact there's a reasonable possibility of retention. This too is no oversight. The issue litigated before the district court was to what extent Pollard may retain details after 32 years. Hudson says nothing about what Pollard may conceivably retain in his head. He stands convicted, so the fact that he had access to and disclosed confidential documents is not really an issue. And there's an interest in his not being able to do so further. If your argument is that, look, nobody could retain this information this far after the fact, why isn't the burden on that point yours? The burden is on the commission to have some factual basis. And I'm suggesting it's met by the fact that he has, he had access to and disclosed confidential documents, and those documents, at least some of them, still retain classified status. So it's really the defense that is coming up with the argument, oh, well, this is material that no one could retain after 32 years. And you're saying now they have to disprove your assertion, and I'm not sure I understand that. Well, number one, I believe they have the obligation to have some factual basis to say that he specifically accessed documents that are still confidential and are of the type that could be retained. Let me give you two examples in why we vigorously ask the court to allow security cleared counsel, because we obtain the highest level of security clearance for this case. We ask the court to allow us to see the examples that they would submit ex parte. For example, if Pollitt had accessed a photograph of an Iraqi military installation that was taken by satellite, let's say, in 1981, and he accessed this and gave it to the Israelis in 1984, while it's true, objectively, as Hudson says, looking at documents of this type, and she doesn't specifically connect any document actually to Pollitt, but looking at documents of this type, one might be able to discern some of the methods used by the United States in taking that photograph. But 32 years ago, Pollitt, without the photograph, simply recounting some generalized details of that was a facility, is not in any position to disclose those details. Similarly, if one of the documents accessed was, for example, four pages of single-spaced computer code, and he gave it to the Israelis, and they copied it, 32 years later, no one could retain any meaningful detail to disclose. What about the names of people who have provided human intelligence? There was no information of that sort, and the government, if you look at the Hudson Declaration, they do not say that he obtained names. What they say is, somebody looking at these kinds of documents, again, not directly connected to Pollitt, could possibly discern from looking at the information, the source, the human source, or the mechanical source of the data. Our point is very simple. Why is it, though, given that he had this kind of material in his possession 30 years ago? 32 years ago. Why is it the government's obligation to take the chance that he's forgotten something, but it will pop into his head, or he does retain it, or whatever? I mean, the operation of his mind does not seem to me to be something that the government either has to prove or that it needs to take a chance on. I mean, the condition has to be rational. It doesn't have to be shown to be, you know, supported by a preponderance of the evidence or any other burden of proof. It has to be rational. We know he had possession of these items. What he remembers or doesn't remember, what links he drew or didn't draw, doesn't seem to me to be something we need to explore. I think it has to be rational, but it also has to be genuine. And the point that we've made in the papers is that when you look at the notice of action, when you look at what they did, when you look at how they tried to justify before Judge Forrest why they said he still possesses a risk of disclosure, you will see that there's nothing genuine. The fact that the government could have, instead of offering the Hudson Declaration in its a similar declaration, which had two components that are missing. One, I have looked at specific documents that Pollard did access. And based on my experience, I can say that at least in my opinion, as a member of the intelligence community, these documents and the details in them, even though they are 32 or 35 years old, are of the type that Pollard reasonably could recall. We were litigating this for a year before Judge Forrest. They specifically asked for the right to do this ex parte. Then they pulled back. And that has to suggest, and I think it does suggest, that what you had here is not a genuinely rational basis of a risk of disclosure, but pretextual. The government went out of its way to jerry-rig and try to find some basis. And when you look at the Hudson Declaration, she doesn't connect the documents to Pollard, and she doesn't, nor does any of our colleagues say, this is of the type that he could retain. Thank you. We'll hear from the government. Good morning, and may it please the Court. My name is Rebecca Tinio, and I represent the respondents in this case. The District Court here correctly determined that the Parole Commission acted well within its broad discretion to impose Mr. Pollard's parole conditions. Now, there's no question that Mr. Pollard is an extraordinary and very unusual parolee. At the time of his crime, victim statements and damage assessments describe the enormous harm to the United States that his espionage activity caused, and he was sentenced to the maximum term of imprisonment, a life sentence. And although Mr. Pollard is now on parole, he continues today to serve that life sentence. He is still under the custody and control of the Attorney General, and he's still under the jurisdiction of the Parole Commission. The special parole conditions are a reasonable means to monitor and supervise Mr. Pollard, to minimize and mitigate risks associated with his release, to aid his reentry into society, and to facilitate his otherwise comparatively non-restrictive release into the community. The Parole Commission had a rational basis in the record to impose each of the Parole Commissions, and I'd like to review some of the most critical pieces of evidence. But what my opponent focused on for almost the entirety of his argument this morning, Mr. Lauer said that all of the conditions are based on the public harm factor, the possible risk of disclosure. That is not correct. The notice of action issued by the Parole Commission shows that there were five factors that are elucidated in the statute and the regulations, only one of which is the need to protect the public from harm relating to a possible disclosure of classified information. And those would be the nature and circumstances of Mr. Pollard's offense, Mr. Pollard's own history and characteristics, deterrence of future conduct, yes, the need to protect the public from harm, and also Mr. Pollard's own rehabilitation. So Mr. Lauer's focus on only one of those factors is misleading. Would there be any need to engage in quite this kind of monitoring but for the risk of harm? I think that's a good question. I think that's a good question. I think that I think the other factors played into that. But I thought it was the risk of harm he continued to pose to United States Intelligence that informed the electronic monitoring. I think, Your Honor, that in fact multiple factors inform the monitoring. For example, the fact that Mr. Pollard could be a flight risk. Again, he remains in the custody and control of the Attorney General, and the Parole Commission specifically said the need to deter him from fleeing the country, which is rationally based in the record, was a reason for his GPS monitoring and curfew, along with the need to comply with his exclusion zones. Mr. Pollard has several exclusion zones, which he has never challenged. He's required to monitor them as well. I assume from your failure to want to discuss risk of harm that you don't think that supports this, that we have to look to these other factors? Not at all, Your Honor. You better tell us why you think there's a current risk of harm. Absolutely. I think Your Honor expressed it very well when you said that the Parole Commission, to the extent that the burden could be construed to be on us, to justify his risk of current harm has been met. He did commit this very serious crime of disclosing the information, and the Parole Commission had before it the Clapper Letter, and that's a letter from the then Director of National Intelligence, James Clapper, which is present in the record at JA 330. And the Clapper Letter, in no equivocal terms, in unequivocal terms, says that a re-review of specific documents and information had been done, and that information that he compromised remains properly classified today at the secret and top secret levels. Now the Clapper Letter also says that the intelligence community believed at the time of Mr. Pollard's parole hearing, and believes today, that the use of special conditions to mitigate the risks of his disclosure is appropriate. And I do want to address some of the insinuations that my opponent made about the Hudson Declaration. Before you turn to them, let me just ask a question about the conditions. I was curious that Mr. Pollard is being subject both to GPS monitoring and to a curfew. Why do you need both if you know where he is all the time? Oh, the two go hand in hand, Your Honor, and I believe in the U.S. Probation Office's Declaration they say that curfew actually is very common, especially when people have location monitoring. When someone is subject to location monitoring, the curfew helps establish a baseline. We know where they're supposed to be between, in Mr. Pollard's case, most days, between 7 p.m. and 7 a.m. He's supposed to be at home. Now, the location monitoring equipment is programmed to incorporate that. If he leaves his residence during the time when he's supposed to be there, an alarm goes off and an alert is sent. The same thing happens if he goes into one of his exclusion zones. It also, frankly, just helps the probation office monitor and supervise him. It kind of limits the hours of the day when he might be out and about. So the two really go hand in hand. Thank you for the question. And going back to Mr. Lauer's statements and suggestions about the Hudson Declaration, which was issued by another person from the Office of the Director of National Intelligence, the Parole Commission and the government did not rely on that declaration. That's true. The Parole Commission had before it only the Clapper Letter, which I've already discussed as being sufficient to meet whatever burden the Parole Commission may have. Now, in April of 2016, the district court issued an order that suggested that the court was very interested in the public harm element and suggested that perhaps the government might want to provide the district court in camera with specific examples of classified information. And there was some litigation about that in letters that resulted in a June order. And the government, although the government did not feel it needed to rely on an additional declaration, was willing to provide that information with specific reference to setting. And the government made that very clear in its letters. Now, in the course of the litigation, and Mr. Lauer referred to, for example, the access of counsel issue, it became less clear that if the government provided that information, it would be permitted to remain in an ex parte situation. And because the ex parte nature of what the government was willing to disclose was perhaps in some risk, we did decide, especially because, you know, this information had not been before the Parole Commission. I apologize, Judge Kaplan. The government's view was that it did not need to rely on specific reference to classified information because that had not been before the Parole Commission. And so the government did change its approach and elect to present as much information as it could in an unclassified setting, which resulted in the Hudson Declaration. But contrary to my opponent's suggestions, the Hudson Declaration does make reference to another specific re-review of actual documents. In addition to the human intelligence described in the Hudson Declaration, as Your Honor referred to, there's also signals intelligence and geospatial intelligence referred to in the Hudson Declaration with reference to specific documents that had been re-reviewed by the intelligence community. And, you know, this declaration is subject to presumption of regularity and truthfulness. There's absolutely no reason in the record to question the genuineness of the declaration or the motives of the government. But as I've mentioned before, that is only one of the five factors, and it's really only one piece of the record evidence that the Parole Commission relied on. And briefly, with the time I have remaining, with respect to one of the statutory factors, the nature and circumstances of the offense, the Parole Commission properly examined that and looked at the enormous volume of the information that Mr. Pollard had turned over, had looked at the deceptive nature of the crime, the fact that Mr. Pollard misled FBI interrogators for days after he was initially apprehended in order to allow aspects of his crime and his co-conspirators to escape. The Parole Commission looked at victim impact statements, at the damage that Mr. Pollard's crime had caused. The Parole Commission looked at Mr. Pollard's own history and characteristics. And in this respect, I'd actually like to point out specifically the letter that the Parole Commission relied on from Admiral Studeman from 1995, which is at JA-300. And in 1995, Mr. Pollard had a one-third parole hearing, and Admiral Studeman provided this letter to oppose the grant of one-third parole at that point. So that was 1995, ten years after Mr. Pollard had been arrested, ten years after he had presumably last seen a classified document. And at that point, Admiral Studeman said, Mr. Pollard has an excellent memory. He remembers information. He's tried to disclose technical information about sources, methods in his prison correspondence. You know, we at Admiral Studeman said in his letter, we believe that he does possess in his head, as Your Honor said, the operation of his mind. They, at that point, did believe that he did still possess classified information in his head. And so in a lot of respects, my opponent is actually asking the Court to assume that Mr. Pollard forgot that, forgot information that we know he retained at least ten years after his arrest. Unless there are no further, unless there are further questions in the panel, the government would just conclude by saying that the Court should affirm the judgment of the District Court. Thank you. Mr. Lauer. The regulations narrow the statutory conditions. What it all boils down to is they need to have at least a factual finding that there is a need to deter criminal conduct or protection of the public from further crime, and that all boils down to whether he retains any information. As to flight risk, and I think this Court has the opportunity to strip away the facade and to see whether these conditions are genuinely needed. Supposedly, he's a flight risk who might flee to Israel. Of course, Israel has all of the information that Pollard provided to the Israeli agents in 84 and 85. But of the Commission's true motives unmasked, when they sharply accused Pollard of being a flight risk because two congressmen wrote the Attorney General and asked for permission, for Pollard to have permission lawfully to move to Israel. They say Pollard is a dissembler, and they say he has a recent propensity to dissemble because at the mandatory parole hearing he represented that he had employment, and then counsel advised Pollard not to take that employment after the conditions for computer monitoring were imposed because counsel felt it was unfair to the prospective employer. And whether the Commission agrees with counsel's recommendation or not, that says nothing about Pollard's integrity. There's absolutely no dissembling because the written employment agreement was provided to the Commission at the mandatory parole hearing. But the charge of flight risk, the charge of dissembling, take the Studeman letter. The Studeman letter, 20 years ago, is an absolutely false document because it's a cynical document because Studeman accuses Pollard of 14 times writing potentially confidential information. But the process that was in existence at the prison at the time was Pollard's letters were all submitted for review, and they were censored. And had the United States government been of the view at the mandatory parole hearing in 2015 that these letters violated any rule or procedure, they would have brought that up at the mandatory parole hearing. But in the case of incarceration, he had followed all the rules. There were no material infractions. I'm a little confused by that, which is a point you made in your brief. Yes. To the extent that he sent letters that contained classified information that were therefore censored, I'm not sure why, whether he was sanctioned for it or disciplined for it, is the relevant out of prison on parole without monitoring, there was more of a risk that he could communicate without it coming to the attention of the authorities. So it seems to me that the fact that he did attempt to disclose this information in various letters in prison is relevant for the commission to consider in deciding to put him on monitoring outside of prison so that there would be something comparable to what they were able to do while he was in prison to ensure that there were no communications. What am I missing? I think the Court respectfully is conflating two issues. The Studeman letter was not offered on the issue of what does he retain back in 1995. It was offered in 1995 to show that he was not following rules. And our point is the government... I understand that he had communicated, he had attempted to communicate classified information. Now, I'm just reading the relevant portion, and unless I've missed something, I agree he doesn't say, therefore, he remembered this material. But the fact that he was communicating it showed that he remembered it at least for a significant period of time. And you want us to say, well, what he remembered at 10 years is not what he remembers at 30 years. That doesn't seem obvious to me. No, but I want the Court to keep in mind is two things happened between 1995 and 2016 and 2017. One, the passage of another 20 years. Two, most of the information that was accessed in 1984 and 1985 that was created 32, 35, or 40 years ago is no longer confidential. Let me just address computer monitoring for a minute. There is absolutely no purpose for workplace computer monitoring when Pollard can walk through Manhattan, talk to anyone, he can use a phone, he can call anyone in the world, he can send old-fashioned notes and letters, he can speak to anyone. There's simply no legitimate government purpose other than creating an embarrassment and a burden on Pollard to hold a white-collar job because it's simply unfair to expect a financial firm to have computer monitoring. This is not a situation where you've got a pedophile or a drug dealer where you can put some search terms in and block it. You cannot today as a college graduate have a white-collar job and not use the internet and effectively this prevents that. We would ask the Court to remand and let the Commission do its job appropriately. Thank you. All right, we'll take the case under advisement.